IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
|---|---|---|
| | : | NO. 09-462 |
| v. | : | |
| | : | |
| ALEX WADE | : | |

**MEMORANDUM**

**SÁNCHEZ, J.**                                                                **MARCH 29, 2010**

On July 14, 2009, Alex Wade was charged with one count of possession with intent to distribute five grams or more of cocaine base (crack), in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), and one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). On March 17, 2010, Wade moved to suppress the physical evidence recovered the crime scene. He argues that the searches and seizures of his person and the automobile in which he was sitting were unconstitutional. Because the Court finds that the searches and seizures complied with the requirements of the Fourth Amendment, Wade's motion to suppress the physical evidence will be denied.

**FINDINGS OF FACT**

1. On May 1, 2009, at approximately 11:30pm, Philadelphia Police Officers Bernard Spain and Thomas O'Brien were traveling west on Westmoreland Street in a marked police wagon. Both officers were in full uniform. Officer Spain was driving and officer O'Brien was sitting in the passenger seat.

2. Officers O'Brien and Spain were assigned to a detail known as "Pressure Point," which was designed to combat criminal activity within a ten block by eight block high crime area in the

thirty-ninth police district.[1] The area has a high incidence of murder, rape, and drug trafficking.

3. The 1600 block of Westmoreland Street is a residential area that, on May 1, 2009, was poorly lit.

4. As the officers approached the intersection of Westmoreland Street and 17th Street, officer O'Brien observed the brake lights of a car parked on the north side of Westmoreland Street flicker on. The car was parked in front of a vacant lot. The engine of the car was not running and its lights were off.

5. As the officers drove alongside the parked car, officer O'Brien observed an adult male in the driver seat. He had a look of "complete surprise" on his face. Audio Recording: Mot. To Suppress Hr'g, 2:05:55, Mar. 25, 2010. The male was later identified as Alex Hendricks.

6. Officer O'Brien exited the patrol wagon to investigate. As he did so, he kept his gun holstered but immediately turned on his flashlight and approached the driver's side window. In addition to Hendricks, O'Brien observed an adult female, later identified as Kayla Ranier, sitting in the passenger seat. He was unable to see into the rear compartment of the vehicle because it was filled with luggage, clothing, and other such objects.

7. While officer O'Brien approached the parked vehicle, officer Spain moved the patrol wagon backwards so that the front, passenger-side quarter panel of the patrol wagon was aligned with the rear, driver-side quarter panel of the vehicle. Spain testified that he positioned the wagon this way because, if the encounter were to become violent, the front compartment of

---

[1] As of May 1, 2009, officer O'Brien had been employed with the Philadelphia Police Department for approximately one year and officer Spain had been with the Philadelphia Police Department for approximately seven years.

the wagon would not be in the direct line of fire from the front compartment of the vehicle. Spain then activated the wagon's emergency lights. Parked in this manner, the wagon did not obstruct the vehicle's ability to leave its parking spot.

8. While officer Spain was parking the patrol wagon, officer O'Brien asked Hendricks for his driver's license, registration, and proof of insurance. Hendricks was unable to provide any of the requested documents. The officers later determined that the car belonged to Ranier.

9. When Hendricks was unable to provide the requested documentation, officer O'Brien determined that Hendricks had violated the law by driving without a driver's license.

10. For safety purposes, officer O'Brien asked Ranier to place her hands on the dashboard and Hendricks to place his hands on the steering wheel. Both complied.

11. Officer O'Brien then asked Hendricks and Ranier what they were doing in the car. Only after they put their heads together and quietly conferred did Hendricks state that they were giving someone a ride. Both Hendricks and Ranier were visibly nervous and appeared afraid to answer O'Brien's question. Officer O'Brien testified that he found this behavior "immediately suspicious." Audio Recording: Mot. To Suppress Hr'g, 2:08:45. I find his testimony on this point to be credible.

12. Officer O'Brien extracted Hendricks from the car and frisked him. He found nothing suspicious.

13. While officer O'Brien engaged Hendricks, officer Spain approached the driver's side of the vehicle and, while standing to O'Brien's right, observed movement in the back seat of the vehicle. His line of sight into the back seat was obstructed, however, by the objects that were piled high in the back seat so he was initially unable to determine the source of the

movement.

14. Officer Spain was concerned that there might be an individual hiding in the back seat of the vehicle. In light of the circumstances, I find that his concern was reasonable.

15. To rule out the possibility that there was an unaccounted-for person in the back seat of the vehicle, Officer Spain circled around the rear of the vehicle and approached the rear, passenger-side door. Upon looking through the open window, he observed an adult male, later identified as Alex Wade, slumped down in the back seat. Wade had a black jacket draped over his left arm. In his left hand, Wade held an open cell phone. Spain believed that Wade was not actually speaking to anyone but had merely opened the cell phone when Spain approached. Spain could not see Wade's right hand, but he observed Wade's right arm moving toward the right waistband of his pants where officer Spain thought a gun might be hidden. Despite officer Spain's request that Wade stop moving, he continued to fidget throughout the encounter.

16. Through an open window, Spain asked Wade for identification. Wade claimed he did not have identification but gave Spain his name and date of birth. Spain radioed the information to police headquarters. A search revealed no warrants and no records of Wade.

17. Officer Spain, who still had his flashlight in his hand, extracted Wade from the vehicle to frisk him for safety purposes. As Wade was exiting the car, he stated "it's not mine." Audio Recording: Mot. To Suppress Hr'g, 2:12:28, 2:39:25. After Wade was outside the vehicle but before the frisk began, Officer Spain noticed "in plain view" the handle of a handgun in the crease of the backseat where Wade had been sitting. Audio Recording: Mot. To Suppress Hr'g, 2:58:45. I find that Wade's statement was a denial that the gun belonged to

him.

18. With Wade standing outside the vehicle, officer Spain placed his flashlight in his pocket and removed the gun from the crease of the backseat and placed it in his other pocket. Without specifically mentioning that he had found a gun, Spain told O'Brien to place Hendricks back in the car. O'Brien complied.

19. Officer Spain then took Wade to the back of the police wagon where he was frisked for the first time, handcuffed, and placed under arrest. The frisk revealed $3,362 in cash.

20. After securing Wade in the police wagon, officer Spain showed officer O'Brien the gun he had found in the back seat of the vehicle.

21. Officer Spain returned to the vehicle to recover Wade's jacket and cell phone. He believed the jacket and cell phone belonged to Wade because he had observed Wade holding both objects. I find credible Spain's testimony with respect to these observations.

22. A search of the jacket pockets revealed a black electronic scale, a straw cut on an angle, and a ziplock bag containing other new, unused ziplock bags.

23. Officer Spain also felt several objects inside the seam of the jacket. Based on his experience, he knew one of the objects was a plastic bag containing marijuana. Upon opening the seam, he found a bag of marijuana and a bag of crack cocaine.

24. The officers secured Ranier's consent to search the vehicle. Officer O'Brien observed ziplock bags containing narcotics residue on floor adjacent to the passenger seat. He also found a used, empty crack pipe. Officer O'Brien admitted that didn't notice the drug paraphernalia until after the officers performed the consent search.

**DISCUSSION**

The Fourth Amendment guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Ordinarily, a warrant based on probable cause is required to justify a search or seizure. *See United States v. Crandell*, 554 F.3d 79, 83 (3d Cir. 2009). In limited circumstances, however, a warrantless search or seizure can be legal. *See id.* In this case, it undisputed that the officers did not have a warrant when they approached the vehicle. The Court must therefore decide two issues: first, whether there was a seizure; and second, if so, whether the seizure was reasonable. *See United States v. Smith*, 575 F.3d 308, 313 (3d Cir. 2009).

First, the Court must determine whether the officers were entitled to approach the vehicle and demand documentation. The Fourth Amendment is not implicated where officers merely approach an individual in a public place and ask questions. *See United States v. Drayton*, 536 U.S. 194, 200 (2002). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage-provided they do not induce cooperation by coercive means." *See id.* (citing *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991)). "A seizure occurs only 'when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *See Crandell*, 554 F.3d at 84 (citing *Terry v. Ohio*, 392 U.S. 1, 19-20, n.16 (1968)) (alterations in *Crandell*). "If a reasonable person would feel free to terminate the encounter, then he or she has not been seized." *See Drayton*, 536 U.S. at 200.

When officers O'Brien and Spain initially approached the vehicle, the individuals inside that vehicle were not seized because a reasonable person would have felt free to terminate the encounter.

6

The police wagon was parked in manner that allowed the vehicle to leave freely. The officers kept their weapons holstered and made no show of authority. They did not order the occupants of the vehicle to do anything except produce a driver's license, registration, and proof of insurance, which they were entitled to do under *Drayton*. *See id.* Because there was no seizure, the officers did not violate the Fourth Amendment.

The Government concedes that after Hendricks failed to produce a valid driver's license, the questioning escalated into a traffic stop. *See* Gov.'s Br. at 7. Traffic stops are seizures subject to the Fourth Amendment's reasonableness standard. *See Whren v. United States*, 517 U.S. 806, 810 (1996). When an automobile is seized, all the occupants of the vehicle are likewise seized. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979). The Court must decide whether it was constitutionally permissible for the officers to seize the vehicle.

A traffic stop is governed by the standard set forth in *Terry*. *See United States v. Delfin-Colina*, 464 F.3d 392, 298 (3d Cir. 2006). The seizure of a vehicle is reasonable "when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop." *See id*. The Third Circuit has instructed that when "determining whether a stop is justified, the court must view the circumstances surrounding the stop in their entirety, giving due weight to the experience of the officers." *See United States v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984).

The Court finds that the officers possessed specific, articulable facts at the time of the traffic stop that an uninsured vehicle was being operated by an unlicensed driver in violation of Pennsylvania law. Officer O'Brien testified that when he approached the vehicle and asked for Hendricks's driver's license and the vehicle's registration and proof of insurance, Hendricks was

7

unable to provide the requested documents. He further testified that when he asked where the occupants were going, Hendricks first conferred with Ranier and then nervously replied that they had been giving someone a ride. Hendicks's inability to provide the requested documents in conjunction with his statement that he had given someone a ride constitutes specific, articulable facts that led officer O'Brien reasonably to conclude that Hendricks had been operating the vehicle without a driver's license, registration, or proof of insurance in violation of Pennsylvania law. Additionally, Hendricks's presence in a high crime area at night, combined with his nervous behavior and his refusal to tell O'Brien what he was doing without first consulting Ranier constitute specific, articulable facts to support O'Brien's reasonable suspicion that criminal activity was afoot. The traffic stop was therefore constitutional and the officers were entitled "to exercise reasonable superintendence over the car and its passengers." *See United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004).

The final issue for the Court's review is whether the frisk and arrest of Wade were constitutional. The Supreme Court has held "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *See Maryland v. Wilson*, 519 U.S. 408, 415 (1997). In this case, then, because the officers were conducting a valid traffic stop, they were entitled to order Wade out of the car. *See id.* Officer Spain credibly testified that after Wade exited the car but before he was frisked, officer Spain saw the handgun in plain view on the seat Wade had occupied. An officer "has probable cause to arrest an individual for violation of [Pennsylvania's handgun licensing statute] based solely on the officer's observation that the individual is in possession of a firearm on the streets of Philadelphia." *See United States v. Bond*, 173 Fed. Appx. 144, 146 (3d Cir. 2006) (citing *Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. Ct. 1996)).

8

The frisk and arrest of Wade were thus constitutionally permissible.

Alternatively, the frisk of Wade was constitutionally permissible because officer Spain possessed specific, articulable facts that Wade was involved in criminal activity. The vehicle was parked on a dark street in a high crime area. Wade was slumped down in the back seat of the vehicle, largely hidden from view. When Spain approached, Wade was visibly nervous and fidgety. While Spain was speaking to Wade, Wade reached toward his waistband of his pants where Spain thought a gun could be hidden. When viewed in totality, Spain's observations were sufficient to raise a reasonable suspicion that Wade was involved in criminal activity. Accordingly, Spain was entitled to remove Wade from the vehicle and frisk him to ensure that he did not have a weapon. *See Terry*, 392 U.S. at 30-31.

Because the arrest was justified on the grounds that Wade possessed a handgun, so to was the subsequent search of Wade's jacket. *See Arizona v. Gant*, —U.S.—, 129 S. Ct. 1710, 1719 (2009). *Gant* allows officers to search a vehicle subsequent to a lawful arrest where it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *See id.* (citing *Thornton v. United States*, 541 U.S. 615, 632 (2004)) ("we also conclude that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'"). In discussing this exception to the general requirement that a warrant be obtained prior to a search, the Court acknowledged that the exception would likely apply under the facts of an earlier case, *United States v. Belton*, 453 U.S. 454 (1981). There, after stopping a vehicle for a traffic violation, an officer observed evidence of marijuana use. *See Belton*, 453 U.S. at 455-56. He extracted all the occupants of the vehicle, placed them under arrest, and searched a black leather jacket that belonged to the

defendant. *See id.* The Court in *Gant* intimated that such a warrantless search was constitutional because it was "reasonable to believe that evidence relevant to the crime of arrest might be found in the vehicle." *See Gant*, 129 S. Ct. At 1719 ("But in other[] [cases], including *Belton* and *Thornton*, the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein."). The facts of the present case are analagous. After officer Spain arrested Wade for possession of a firearm, it was reasonable for him to believe that he might find contraband–such as another gun, ammunition, or drugs–in Wade's jacket. Therefore, pursuant to *Gant*, the search of Wade's jacket was constitutional.

**CONCLUSIONS OF LAW**

1. When officer O'Brien approached the vehicle and asked for Hendricks's license, registration and proof of insurance, there was no seizure and, thus, the Fourth Amendment was not implicated.

2. Officer O'Brien's subsequent seizure of the occupants of the vehicle was justified because he had a reasonable basis to suspect that criminal activity was afoot.

3. When officer Spain extracted Wade from the vehicle, he had both reasonable suspicion to believe that criminal activity was afoot and probable cause to believe that criminal activity had occurred.

4. Officer Spain was justified in retrieving and searching Wade's jacket because it was reasonable to believe that evidence related to the crime of arrest might be found in the jacket.

5. Accordingly, Wade's motion to suppress the physical evidence will be denied.

An appropriate order follows.